THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


MARISOL ARDON                                                          PLAINTIFF

v.                                      CIVIL NO. 21-05044

KILOLO KIJAKAZI,[1] Acting Commissioner                                DEFENDANT
Social Security Administration


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION


Plaintiff, Marisol Ardon brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.   42 U.S.C. § 405(g).

## I.    Procedural Background

Plaintiff protectively filed her applications for DIB and SSI on May 29, 2018, alleging an inability to work since March 17, 2017, due to a back disorder, left hip pain, hernia, history of a benign tumor 25-pound tumor in her stomach, hypothyroidism, anxiety, and asthma. (Tr. 12, 245).

---

[1] Kilolo Kijakazi has been appointed to serve as the Acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

Plaintiff amended her onset date to June 23, 2017, in a brief from her representative dated January 9, 2020. (Tr. 341). An administrative hearing was held on January 9, 2020, at which Plaintiff appeared with counsel and testified. (Tr. 31–62). Plaintiff confirmed her amended onset date at this hearing. (Tr. 36).

On June 24, 2020, the ALJ issued an unfavorable decision. (Tr. 12–23). The ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe: degenerative disc disease, anxiety disorder, post-traumatic stress disorder, and obesity. (Tr. 14–15). However, after reviewing all evidence presented, the ALJ determined that through the date last insured, Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 15–17). The ALJ found Plaintiff retained the residual functional capacity (RFC) to

> perform sedentary work as defined in 20 CFR. 404.1567(a) and 416.967(a) except the claimant is limited to occasional stooping, kneeling, crouching, and crawling. The claimant should avoid even moderate exposure to pulmonary irritants such as dusts, fumes, odors, gases, and areas of poor ventilation. The claimant is able to have routine but superficial interpersonal contact with others. The complexity of tasks is learned by experience with several variables and judgement within limits. The claimant requires little supervision for routine tasks, but detailed supervision for non-routine tasks.
> (Tr. 18–22).

With the help of a VE, the ALJ determined that Plaintiff could perform her past relevant work as a telephone information operator, both actually and generally as performed. (Tr. 22–23). The ALJ found Plaintiff had not been under a disability, as defined by the Act, from March 17, 2017, through June 24, 2020, the date of his decision. (Tr. 23).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which was denied on January 5, 2021. (Tr. 1–3). Subsequently, Plaintiff filed this action. (ECF No. 2). The parties have filed appeal briefs and this case is before the undersigned for report and

recommendation pursuant to 28 U.S.C. §36 (b). (ECF Nos. 15, 20, 21). The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs and repeated here only to the extent necessary.

## II.    Evidence Presented

On May 9, 2017, Plaintiff saw Rebecca Lewis, DO, with complaints of chronic anxiety. (Tr. 485).  Plaintiff reported she was raising an 8-year-old nephew of hers and having many issues. She was not feeling well and had an appointment in June to check her thyroid gland; Dr. Petrino had also diagnosed a small hiatal hernia and Plaintiff was anxious to have the hernia repaired. Plaintiff was prescribed Xanax and directed to follow up with her endocrinologist and Dr. Petrino.

On June 13, 2017, Plaintiff was seen by Philip Cedeno, MD, for hernia repair. She had been experiencing nausea, fever, chills, and lower abdominal pain for the last four days. (Tr. 414). Plaintiff was having significant reflux, which was worsening despite medication, and she desired operative intervention. She understood the risks and possible complications of the operation. (Tr. 416). Plaintiff's diagnosis was gastro-esophageal reflux disease ("GERD") without esophagitis and Dr. Cedeno planned to perform a preoperative ultrasound to rule out any coincidental gallbladder disease.

On June 21, 2017, Plaintiff had surgery that was intended to be for a hiatal hernia but resulted in the removal of an abdominal mass and a hysterectomy. She had a preoperative diagnosis of hiatal hernia; however, the planned laparoscopic procedure for hiatal hernia was aborted upon discovery of a large pelvic abdominal mass, measuring up to 30cm in size. (Tr. 422). Dr. Cedeno discussed the issue with her family, who requested that they proceed with operative intervention, so a gynecological surgeon, Dr. Hanna, was the primary surgeon. (Tr. 424). They also discovered

3

a multilobulated uterus with fibroids and a large fibroid in the lower uterine segment on the left side of the pelvis which was cystic. (Tr. 422). They performed a total abdominal hysterectomy with bilateral salpingo-oophorectomy with retroperitoneal dissection of pelvic mass and her post-operative diagnoses were pelvic/abdominal mass arising from the right adnexa and uterus, and cystic cell adnexa. The mass was removed, analyzed and determined to be a 20-pound adnexal mass which was benign. (Tr. 716- 18). Plaintiff was discharged on June 28, 2017, ambulating under her own power and tolerating a regular diet. (Tr. 427).

On July 3, 2017, Plaintiff had a post-surgery follow-up with Dr. Cedeno and reported constipation for the last four days that was causing her abdominal pains. (Tr. 749–52). Plaintiff's staples were removed, she was given recommendations for laxatives, and was asked to follow up in 4 weeks or sooner, as necessary.

On July 27, 2017, Plaintiff had a follow-up visit with Dr. Cedeno. Plaintiff was doing well and was getting back to her normal routine. (Tr. 747–49).

On August 16, 2017, Plaintiff was seen by Dr. Lewis for cold, cough, and congestion, as well as a refill of her thyroid medication. (Tr. 482). Plaintiff was still not back to work but had done fairly well since the surgery. Plaintiff was assessed with an acute upper respiratory infection, hypothyroidism, and menopausal syndrome. She was prescribed levothyroxine and Amoxil and was asked to follow up with her OB/GYN in the near future for a post-op check.

On October 4, 2017, Plaintiff was seen by Dr. Lewis, for mid to low back pain and allergies. (Tr. 481). A physical examination revealed paravertebral spasm of the lumbosacral spine. Plaintiff was assessed with allergic sinusitis vs viral upper respiratory infection, acute lumbar strain, and

mild obesity. Plaintiff was to take a Medrol Dos Pak and would be referred to physical therapy for evaluation of her low back pain and core strengthening.

On October 10, 2017, Plaintiff had an initial evaluation at Holly Street Physical therapy for low back pain. (Tr. 440). Plaintiff reported her onset date as June 21, 2017, about a month after surgery. She had constant pain that was worsened with standing, lifting, and walking, and was at a 6/10 on the pain scale at this visit. Plaintiff was having difficulty getting out of bed in the morning and was very tender moving from a sitting to standing position. She had an up slip on the left during a joint integrity test of the pubic symphysis, she had pain at end range in every area, and her lumbar spine movement rating was very restricted in every area. (Tr. 441). Plaintiff's hip strength testing showed 4/5 on abduction and adduction, but 3/5 for hip flexion. Her knee strength testing was 4/5 for both extension and flexion. Plaintiff was to go to physical therapy three times weekly for four weeks. (tr. 442). Plaintiff attended physical therapy as scheduled through November 27, 2017, and reported some progress in her activities of daily living, including walking daily and feeling less uneven while doing so, but continued to have soreness. (Tr. 433, 445, 446, 449, 451, 453, 455, 458, 460).

On October 24, 2017, Plaintiff saw Dr. Cedeno and reported back pain for the past month, noting she had been attending physical therapy and that her primary care physician advised the pain may have been caused by her surgery. (Tr. 744–46). Dr. Cedeno noted Plaintiff generally was doing well post-surgery.

On December 13, 2017, Plaintiff saw Dr. Lewis, for acute cough, congestion, and sinus pressure. Plaintiff was taking levothyroxine for her hypothyroidism and still suffered from chronic intermittent anxiety, but she had not had a recent panic attack. She reported not taking her Xanax

daily.  She had complaints of chronic, ongoing low back pain; she had finished physical therapy in October. She was referred for either an X-ray or MRI but continued to have pain in the midline of the entire lumbar spine. A physical examination showed (a) tenderness in her face over the maxillary sinuses and periorbital swelling, as well as (b) paravertebral spasm of the entire lumbar spine, (c) positive straight leg testing and (d) mild neuritis in her left hip and buttock. (Tr. 480). Plaintiff was assessed with chronic ongoing low back pain, an acute upper respiratory infection, chronic anxiety with a history of panic disorder, and hypothyroidism. She was referred for an MRI of the lumbosacral spine, prescribed a Z-pack and Xanax, and instructed to return after the MRI.

On December 27, 2017, Plaintiff underwent an MRI of her lumbar spine without contrast which showed mild degenerative changes involving the lumbar spine without disc herniations; grade 1-2 anterolisthesis of L5 relative to S1, which contributed to severe bilateral neural foraminal stenosis; bilateral pars defects at the L5/S1 level were not definitively visualized and it was noted that correlation with plain films may be beneficial. (Tr. 491).

On February 20, 2018, Plaintiff was seen for lumbar spine evaluation by Zane Grimes, PA, with complaints of worsening low back pain that radiated into the buttocks, thighs, legs, and feet. (Tr. 505–510). Plaintiff's pain was exacerbated by activity and relieved by lying down and sitting. She was using activity modification and muscle relaxants, and her goal for physical therapy was decreasing pain and increasing movement. A physical exam revealed tenderness in the lumbar spine with restricted and painful flexion and extension. (Tr. 509). However, her gait and station were normal, and all motor groups were within normal limits of strength and tone. PA Grimes noted Plaintiff's MRI showed spondylolisthesis due to bilateral pars defects which also contributed to bilateral foraminal stenosis. PA Grimes saw no evidence of significant change on flexion-extension films. Plaintiff was uninterested in surgery but wanted to try injections, so she was

referred to Dr. Weilert for Lumbar Epidural Steroid Injections ("LESI"). Plaintiff reported a history of chronic numbness in both hands, imbalance, and hyperreflexia on exam which was suspicious for myelopathy and C-spine MRI was discussed to rule out cord compression.

On April 16, 2018, Plaintiff was seen by Dr. Lewis for low back pain that was persistent and causing distress. Plaintiff reported being advised she needed back surgery for spondylolisthesis of the L5-S1. She denied any numbness or tingling in her legs; however, she stated that her low back pain had been consistently worsening over the last month or so. (Tr. 479). A physical examination was grossly normal, except for moderate spasm of the lower spine. Plaintiff was assessed with chronic, ongoing low back pain with a history of spondylolisthesis of the low back at L5-S1; hyperthyroidism; and a history of chronic anxiety with panic disorder, now flaring. Plaintiff's Xanax prescription was refilled, and she was given steroid injections of Decadron and Depo-Medrol in her left hip.

On May 30, 2018, Plaintiff saw Brandon Evans, MD, to follow up on the lumbar MRI and reported continued constant and severe low back pain which radiated down her legs, worsened with activity, and prevented sleep at times. (Tr. 502–504) A physical exam was grossly normal including gait, station, and motor strength and tone; however, Plaintiff was slow to stand straight and reported pain with standing. Dr. Evans explained the findings, using MRI findings to advise Plaintiff that her symptoms were unlikely to improve due to non-healed pars fractures (spondylosis) bilaterally which typically required surgery to alleviate pain. Evans advised against opioids due to their known risks, and because they would not improve her spines' structural problems. Plaintiff indicated she would like to think about the surgery and would contact the office when she decided.

On September 17, 2018, Plaintiff saw Mary J. Sonntag, Psy.D., for a consultative mental examination (Tr. 527–29). Plaintiff reported that she was not thinking straight and had not been since her tumor removal surgery. Despite her anxiety medication, Plaintiff was experiencing panic attacks where she couldn't breathe and overthought two or three times a day for three to five minutes at a time, and sometimes vomited. Plaintiff had never been hospitalized for mental health treatment but had been to 3-4 therapy sessions with students at John Brown University in 2016, and her physician, Rebecca Lewis, DO, had prescribed her 1mg of daily Alprazolam for the past five years. She took her medication as directed with no side effects, and believed it helped, but expressed that she needed to see someone. She lived with her second daughter and had never lost a job due to her mental impairment; her interactions with supervisors and coworkers were reported excellent. She had been working as a call specialist at a crisis center for fifteen years and until June of 2017 when she quit for medical reasons. Plaintiff's hygiene was noted to be average, her attitude good, and she was cooperative. (Tr. 528). Her affect and speech were within normal limits. Her thought process was logical and relevant, and she exhibited no perceptual abnormalities or abnormal thought content. She admitted suicidal thoughts five years prior, but none recently. No pain indicators were exhibited during the session, or when she arose from her chair to leave the evaluation. She was able to name three but not four recent presidents, three (though not five) large cities, and the states bordering Arkansas, but did not know the name of the Governor of Arkansas and she gave 130 as the number of weeks in a year. Her immediate auditory recall test was noted as invalid; she did not get any answers correct. She was able to recall all of three unrelated objects immediately, and after five minutes. Plaintiff was unable to perform the serial 3's task but counted backward from 20 to 1 with no difficulty. She performed single digit calculations at an average pace with three errors. (Tr. 528).

Dr. Sonntag opined that Plaintiff did not meet the criteria for panic disorder but did diagnose her with generalized anxiety disorder. Dr. Sonntag opined as to the impacts of Plaintiff's mental/cognitive impairments on her adaptive functioning, noting she was able to drive familiar and unfamiliar routes with the assistance of GPS, and could shop independently. She could participate in social events such as going out to eat with her daughter but could not handle her personal finances. Dr. Sonntag opined that Plaintiff could communicate in a socially adequate manner, could communicate in an intelligible and effective manner, and could cope with the typical mental/cognitive tasks of basic work like tasks.  Dr. Sonntag opined, however, that Plaintiff's capacity to sustain persistence in completing tasks was poor, and that her ability to perform tasks was slowed but within an acceptable timeframe. Dr. Sonntag noted her ability to sustain concentration on basic tasks was untestable. (Tr. 529). Dr. Sonntag opined Plaintiff's performance on the Immediate Recall portion of the examination appeared as if she was trying to perform poorly, noting that Plaintiff hesitated every time she gave an incorrect number during a stimulus sequence, but her performance improved when she observed the examiner typing her responses to that task. (Tr. 529).

On September 25, 2018, Plaintiff was seen by DO Lewis for chronic anxiety, chronic depression, and allergic rhinosinusitis. She was requesting referral to a psychiatrist and chronic pain management for her ongoing low back problems. (Tr. 532). A physical exam revealed mild swelling of the upper and lower eyelids, as well as moderate erythema of the conjunctiva and clear rhinorrhea. Plaintiff was assessed with acute rhinosinusitis, chronic low back pain, chronic insomnia, chronic depression, and chronic anxiety. She was to be referred to a psychiatrist and chronic pain management, and she was prescribed a Medrol Dos Pak, Xanax, and a ProAir inhaler. She was to follow up in three months.

9

On October 18, 2018, state agency physician Teresa Kramer, Ph.D., reviewed Plaintiff's medical records and opined that, overall, the evidence of record supported a capacity for work where interpersonal contact was routine and tasks involved more than one or two steps, but are not complex, e.g. grocery checker; complexity of tasks is learned by experience, several variables, judgement within limits; supervision is little for routine but detailed for non-routine (semiskilled). (Tr. 90–92). Dr. Kramer listed impairment 7240 DDD (Disorders of Back-Discogenic and Degenerative) as primary and severe, and impairment 3000 Anxiety and Obsessive-Compulsive Disorders as secondary and severe. (Tr. 91). The only listing Dr. Kramer considered was listing 12.06 Anxiety and Obsessive-Compulsive Disorders

On October 29, 2018, Plaintiff was seen by Cathy C. Luo, MD for a consultation for her low back pain. (Tr. 565). Plaintiff reported she had some back pain before a surgery on June 22, 2017, which resulted in the removal of a 25-pound tumor, but the pain became worse after the surgery. The pain started in her low back, radiated to her left thigh, and down to the top of her foot. Any house chores but especially bending over, sweeping, lifting, or walking more than ten minutes increased the back pain. She reported taking a large amount of over-the-counter medication including Tylenol and ibuprofen and having tried physical therapy which was unsuccessful. A steroid shot had provided her some pain relief. Dr. Weilert had recommended back surgery; Plaintiff did not want to have back surgery but would like better pain control. Plaintiff's lumbar spine was tender to palpitation, and extension, lateral bending, and rotation increased lower back pain. (Tr. 567). She had restricted range of motion and a positive straight leg raise on the left. Plaintiff exhibited normal strength in all extremities but decreased light touch sensation in her left lower extremity lateral calf and top of foot. Plaintiff's affect, judgement, and insight were all noted as normal. Plaintiff was assessed with lumbosacral/thoracic radiculitis, lumbar spondylosis,

10

displacement of lumbar intervertebral disc without myelopathy, and chronic pain syndrome. (Tr. 567). Plaintiff was to have a urine drug screen and autonomic nervous system testing and was scheduled for a LESI. (Tr. 568). Plaintiff was dispersed Belbuca 75 mcg buccal film to be taken twice per day. (Tr. 567).

On November 13, 2018, Plaintiff was seen by Keith Berner, MD, seeking treatment for panic attacks, anxiety, and depression. (Tr. 557). She reported longstanding depression and anxiety, reporting she got anxious and short of breath and did not know how to handle it. She reported her primary stressor was the removal of the tumor and the back pain she had been suffering since then along with being unable to work. She struggled with sleep, falling asleep around midnight, and then waking up every one to two hours. She had frequent nightmares and woke up in sweats. She was unable to watch scary movies because she was highly reactive to scary situations.  (Tr. 557).  Plaintiff reported trauma, sharing that her dad was a violent drunk and that she was molested by her brother until she turned 18 and left home. She had several abusive relationships since that time but had supportive relationships with four of her brothers in Arkansas, her godmother, and her children. Currently she was living with her 24-year-old daughter and 3-year-old grandson.  Plaintiff was assessed as having profound childhood trauma leading to lifelong struggles with depression and anxiety, now with worsening mood as her functionality decreased with recent medical struggles. (Tr. 559). Plaintiff's diagnoses were PTSD; major depressive disorder, recurrent, severe; generalized anxiety disorder; hypothyroidism; and obesity. (Tr. 559).

On December 14, 2018, Plaintiff saw Dr. Berner, for depression and anxiety. (Tr. 555). She reported her mood was good, and her anxiety was ongoing but not as bad. Her depression worse at night, but she was doing better and talking more with her godmother and her daughter. She reported stress related to Plaintiff's daughter in Texas who had a verbally abusive boyfriend.

Her sleep was improved.  Although her anxiety worsened at night, the medication helped her sleep, and she was not needing to nap during the day. She had not started therapy and hoped to after getting her second back injection. Plaintiff was noted to have good eye contact and grooming, an appropriate but depressed and anxious affect, fair to good judgment and insight. Plaintiff's escitalopram was increased, and she was encouraged to attend therapy, and to encourage her daughter to seek therapy/treatment; Plaintiff was encouraged to exercise as able.

On January 17, 2019, Plaintiff saw Dr. Cedeno with complaints of nausea, vomiting, and epigastric pain. (Tr. 739-41). A CT scan showed a hiatal hernia with discomfort around the umbilicus; umbilical hernia repair surgery was planned, and Plaintiff was provided samples of medication for occasional heartburn.

On February 1, 2019, Plaintiff saw Dr. Berner, and reported having hernia surgery last Friday which had limited her movement with one more week of restrictions. (Tr. 804–805). Plaintiff reported her mood and sleep were improved. She was working with a lawyer for SSDI and felt ambivalent about this as she would prefer to work, but she had not recovered from her back pain which was preventing her from working. Plaintiff reported continued stress related to her daughter in Texas. She denied side effects of medication and felt she was doing well with her psychiatric medications but had not yet started therapy. She was observed to have good eye contact, a depressed but congruent affect, and fair to good judgment and insight. Plaintiff was instructed to continue medications, provided names of therapists, and encouraged to increase exercise once she recovered from surgery.

On February 14, 2019, Plaintiff saw Dr. Cedeno for a one-week follow-up after hernia surgery with occasional constipation. (Tr. 736-39). Plaintiff was doing well other than some

soreness, which was improving. She was to follow-up at her one-month post-op visit, and work on slowly increasing activity.

On February 28, 2019, Elizabeth Bucolo, Psy.D., reviewed the evidence of record and provided a medical opinion. (Tr. 112–113). Dr. Bucolo listed impairment 7240 DDD (Disorders of Back-Discogenic and Degenerative) as primary and severe, and impairment 3000 Anxiety and Obsessive-Compulsive Disorders as secondary and severe. (Tr. 112). She considered listings 12.04 Depressive, Bipolar, and related disorders; 12.06 Anxiety and Obsessive-Compulsive Disorders; and 12.15 Trauma and Stressor-Related Disorders. Dr. Bucolo also considered new medical evidence including Plaintiff's visit with Dr. Berner on December 14, 2018, and her diagnoses of PTSD, major depressive disorder, and generalized anxiety disorder at that visit. Dr. Bucolo confirmed Dr. Kramer's opinion that Plaintiff had the capacity for work where interpersonal contact was routine but superficial, e.g., grocery checker; complexity of tasks is learned by experience, several variables, judgment within limits; supervision is little for routine but detailed for non-routine (semiskilled).

On February 20, 2019, Plaintiff was seen by Dr. Luo and reported pain in her lower back that ran into her hips; she also reported sleeping problems, back pain and spasms, neck pain, and anxiety but advised her pain medication was working well. (Tr. 726). Plaintiff was tender to palpitation in the cervical and lumbar spine. In her lumbar spine she also had tenderness with extension, lateral bending and rotation increasing the pain. She had decreased range of motion in her lumbar spine and a positive straight leg test on the left. (Tr. 727). Plaintiff had normal motor strength and a normal gait but had decreased light touch sensation in her left calf and the top of her left foot. Plaintiff was prescribed Belbuca and instructed to return to care in two months.

13

On April 24, 2019, Plaintiff was seen by Dr. Luo and had a physical exam with the same findings as her prior visit; however, Norco was added to her treatment plan. (Tr. 722-23).

On March 7, 2019, Plaintiff was seen by Dr. Cedeno with some nausea and occasional periumbilical pains but was otherwise doing well status post repair of her hernia. (Tr. 734–36). She was having discomfort when lifting and increasing heartburn. She was given samples of Dexilant and instructed to report after taking for one week to let Dr. Cedeno know if they were helping.

On March 20, 2019, Plaintiff was seen by Faith Berry, PC for counseling. (Tr. 730). Plaintiff had been referred by Dr. Keith Berner due to depression and anxiety that interfered with daily living. Plaintiff reported frequent depression, panic attacks 2-3 times per day, outbursts, compulsive behaviors, difficulty sleeping, poor self-care, auditory and visual hallucinations in the form of people saying her name when no one was around and shadows (even indoors) for the past two years, a history of trauma and abuse with nightmares of past sexual abuse, a suicide attempt 3-4 years prior, and chronic thoughts of suicide without a current plan. Plaintiff's attention, memory and concentration were noted to be intact, with clear speech and appropriate judgment and thought processes. (Tr. 731).  Plaintiff was noted to appear uncomfortable throughout the session and rated her current abdominal pain as severe. Plaintiff was assessed with severe depressive disorder with psychotic features and generalized anxiety disorder.

On May 1, 2019, Plaintiff saw Dr. Berner and reported good things were happening, including that her daughter – who had been living in Texas with an abusive boyfriend – was moving in with Plaintiff and her other daughter along with her two children. (Tr. 802). Plaintiff was relieved her daughter was safe but reported a busy household. Plaintiff had been attending

14

therapy for about two months with Faith Berry which she found useful but reported that her counselor told Plaintiff that her problems were in her head, and that she needed to get over it, but Plaintiff did not know how to do that. Her initial disability application had been denied, and she had hired a lawyer. Plaintiff reported a great deal of frustration with her life and the physical limitations she had been experiencing over that past couple of years. She had intermittent struggles where she was angry and irritable and felt that her family didn't love her and didn't want to be around her. She had trouble sleeping, which she related to pain, and reported she could be up for much of the night. Dr. Luo recently gave her a new prescription for hydrocodone and a medical marijuana card, but she had not tried the marijuana yet. She had been more active, going outside with her grandchildren and sitting with them as they played, and doing a little more housework. Plaintiff had good eye contact, hygiene and grooming, her affect was congruent with mood and significantly brighter and less depressed than prior appointments. Her judgment and insight were fair to good. Plaintiff reported improvement but continued to struggle with rapid mood instability, anger/irritability, feelings of abandonment, intermittent passive death wishes, consistent with personality instability associated with chronic PTSD. (Tr. 803). Plaintiff was to continue her medications, with Dr. Berner adding lamotrigine for mood stability.

On May 16, 2019, Plaintiff was seen by Faith Berry, PC for counseling. (Tr. 728). Plaintiff continued to report both her anxiety and depression and hopelessness/helplessness in making a change that would decrease her symptomology. (Tr. 729). Plaintiff reported frustration because she kept getting sick and had been in constant pain since her 2017 surgery. She was also frustrated with her prescriptions, as she felt Xanax was the only thing that had worked in the past, and her pain medications were not strong enough. PC Berry noted Plaintiff appeared focused on medication relief rather than overall coping strategies. Plaintiff shared she had applied for

15

disability for the third time with the help of an attorney. Plaintiff presented a high degree of mood instability at this visit. Plaintiff was assessed with severe depressed bipolar I disorder with psychotic features, and generalized anxiety disorder.

On June 5, 2019, Plaintiff saw Dr. Berner and reported she had an allergic reaction to lamotrigine and began throwing up about five minutes after taking it, felt sick for three days after and had not taken it since. (Tr. 800). Plaintiff had stopped seeing counselor Faith Berry reporting that Berry had called her a liar and said she was lying to her doctors; Plaintiff reported that Berry upset her at every visit, so she stopped going and requested another therapist. She was sleeping better and had recently enjoyed a vacation in Florida. She reported her back was slowly improving, although it had worsened following sitting in a car. She continued to struggle with irritability but had some improvement. Her daughter from Texas was still living with her and it was good to be around her grandkids, although it was sometimes overwhelming. Plaintiff was well-groomed with good hygiene, fair to good insight and judgment, appropriate speech, affect, and thought content. Plaintiff's escitalopram was restarted, and Plaintiff was encouraged to immediately call if she had side effects with a prescription. She given a list of providers and encouraged to restart therapy. (Tr. 801).

On June 6, 2019, Plaintiff underwent her three month post umbilical hernia surgery follow-up with Dr. Cedeno who noted Plaintiff was doing well with complaints only of occasional, intermittent, left upper quadrant pain and heartburn. (Tr. 732–34). She was to follow up with Dr. Cedeno as needed.

On June 19, 2019, Plaintiff had a visit with Vijay Kannam, MD, to establish care for pain management as Dr. Luo had ceased practice. (Tr. 779). Plaintiff had complaints of low back pain

16

that had radiated down her left leg and into her toes with tingling and numbness. The pain had begun two years, near in time to her tumor surgery.  Plaintiff had been treated by Dr. Luo with injections and pain medication and was seeing a psychiatrist for chronic anxiety and depression. Plaintiff's blood pressure was elevated but she denied prior hypertension.  She was gaining weight and had a history of hypothyroidism. A physical exam revealed paraspinal tenderness and muscle spasm in lumbar region as well as slightly limited range of motion due to pain. (Tr. 782). Plaintiff was scheduled to undergo metabolic testing including TSH, A1C, a comprehensive metabolic panel, lipid panel, complete blood count, and urinalysis. (Tr. 784).

On July 12, 2019, Plaintiff was seen by Dr. Berner, reporting she was doing well overall. (Tr. 798). She had enjoyed a recent trip with family to McAllen, TX. She reported her mood had been good overall, although there was some stress about one of her grandchildren's father. Her back was intermittently painful with small improvements. Plaintiff's pain doctor had her license suspended until at least August, so Plaintiff currently was without pain medication but had an upcoming appointment with Dr. Baker. Plaintiff was restarted on gabapentin, as she was no longer taking opiates.

On October 2, 2019, Plaintiff was seen by Dr. Kannam with complaints of left upper quadrant and mid-section abdominal pain, painful urination and bladder spasms, with some diarrhea for the last two days. Plaintiff denied vomiting but did have heartburn that came up into her throat while sleeping. (Tr. 768–72). Her daughter was also having some diarrhea, they had both had the same dinner at a restaurant before this started. Plaintiff was diagnosed with diarrhea, GERD without esophagitis, and essential hypertension. Plaintiff was to start Dexilant for GERD and lisinopril for blood pressure management. She was advised to stay hydrated and given instructions on the BRAT diet.

On October 7, 2019, Plaintiff was seen by Dr. Berner and reported doing well despite having a recent GI bug which had been difficult. (Tr. 796). Her hypertension had not improved with medication. Plaintiff had a new pain management doctor but had been out of pain medication. Plaintiff reported her back/leg pain was worse with weather changes, but she was enjoying her usual activities, except gardening which was curtailed by the pain. Plaintiff reported enjoying time with her kids and grandkids and reported better sleep. She was observed to have good hygiene and eye contact, and an appropriate affect that was significantly brighter than at initial appointments. Dr. Berner opined Plaintiff was doing well overall and setting better boundaries with her family. Her diagnoses continued to be PTSD, major depressive disorder nonpsychotic recurrent, severe, and generalized anxiety disorder. (Tr. 796–97).

On December 9, 2019, Dr. Berner provided opinion evidence in the form of a mental residual capacity form. (Tr. 806–807). He provided diagnoses of PTSD, major depressive disorder nonpsychotic recurrent, severe, and generalized anxiety disorder but did not circle answers in the four areas of adaptive functioning. He checked boxes indicated Plaintiff was markedly impaired in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within ordinary tolerances; her ability to work in coordination with and proximity with others without being distracted by them; her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; her ability to sustain an ordinary routine without special supervision; and her ability to work in coordination with or in proximity of others without being distracted by them. He marked boxes indicating Plaintiff was moderately impaired in her ability to maintain attention and concentration for extended periods; her ability to sustain an ordinary routine without special supervision; and her ability to respond appropriately to changes

18

in the work settings. Dr. Berner opined that Plaintiff had been struggling with anxiety and depression as a result of a markedly violent and unstable childhood which had resulted in continued struggles with anxiety, panic attacks, and emotional disinhibition particularly in situations where she felt unsafe. Dr. Berner noted his struggles to understand how to answer the questions as he not administered testing in areas of inquiry, but opined that PTSD and generalized anxiety disorder undoubtedly continued to lead to a marked impairment in Plaintiff's quality of life.

## III.   Applicable Law

This court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  We must affirm the ALJ's decision if the record contains substantial evidence to support it.  *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently.  *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C.  §  423(d)(1)(A).   The Act defines "physical or mental

19

impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience.  *See* 20 C.F.R. § 404.1520(a)(4).  The fact finder only considers Plaintiff's age, education, and work experience in light of his or her residual functional capacity if the final stage of the analysis is reached.  20 C.F.R. § 404.1520(a)(4)(v).

## IV.    Discussion

Plaintiff raises the following issues in this matter: 1) Whether the ALJ erred in failing to properly evaluate medical opinion evidence and relied on his own lay interpretation of Dr. Sonntag's opinion; and 2) Whether the ALJ erred in failing to resolve a conflict between the Dictionary of Occupational Titles ("DOT") and the VE testimony. (ECF Nos. 15, 21).  Defendant argues the ALJ properly evaluated the medical opinion evidence, and properly found Plaintiff could perform her past relevant work as there was no apparent or actual conflict with the DOT. (ECF No. 20).

### A.  Subjective Complaints and Symptom Evaluation

The ALJ is required to consider all the evidence relating to Plaintiff's subject complaints, including 1) Plaintiff's daily activities; 2) the duration, frequency, and intensity of her pain; 3) precipitation and aggravating factors; 4) dosage, effectiveness, and side effects of her medication; and 5) functional restrictions.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  In so doing, the ALJ must also consider the claimant's prior work record, observations made by third parties, and the opinions of treating and examining physicians."  *Polaski*, 739 F.2d at 1322.

An ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them.  *Id.*  However, "[a]n ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances."  *Wright v. Colvin*, 789 F.3d 847, 853 (8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted).  The Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

Here, the ALJ considered Plaintiff's daily activities, as described in her function reports and her testimony, including spending time with family, reading, watching television, driving, shopping, and preparing meals, caring for a foster child, and crafting beaded bracelets. (Tr. 16, 17, 19). The ALJ considered Plaintiff's subjective pain and discomfort, including her reports of difficulty with lifting, standing, walking, sitting, and bending; needing naps due to fatigue; and difficulty with concentration and completion of tasks due to her conditions. (Tr. 18). The ALJ considered Plaintiff's report that she had panic attacks which included difficulty breathing and nausea. (Tr. 19).

The ALJ considered medical records indicating Plaintiff had undergone surgery to address a uterine cyst and had participated in physical therapy after this surgery. (Tr. 19). He considered Plaintiff's continual reports to her treating providers of her ongoing back pain along with the diagnostic imaging. (Tr. 19–22). The ALJ considered the MRI – taken after Plaintiff had completed physical therapy but continued to suffer from back pain and was observed to have moderate spasms in her lumbar spine — which showed mild degenerative changes of the lumbar spine without herniation but with anterolisthesis, foraminal stenosis, and pars defects. (Tr. 19). The ALJ considered Plaintiff's consultation with a neurosurgeon in May of 2018, who recommended a partial laminectomy and fusion procedure which Plaintiff had not pursued by the time of the ALJ's decision, as well as Plaintiff's continued efforts to seek nonsurgical treatment of her pain. The ALJ considered Plaintiff's choice to pursue conservative treatments including injections, a lumbar brace, and a TENS unit. The ALJ also considered Plaintiff's diagnoses and treatment for anxiety with panic attacks and post-traumatic stress disorder, as well as records reflecting improvements in her depression and anxiety with medical management and talking with family. (Tr. 19).

The Court finds ample basis to conclude that the ALJ properly considered the *Polaski* factors and did not err in his discounting of Plaintiff's subjective complaints of pain.

## B.  Residual Functional Capacity

Plaintiff argues the ALJ's opinion is internally inconsistent as Plaintiff's PTSD was found to be a severe impairment, but the non-examining physicians – whose opinions the ALJ found persuasive – did not account for Plaintiff's PTSD. (ECF No.15, 21). Plaintiff further argues the record lacks objective mental function test results as the ALJ discounted Dr. Sonntag's findings and Dr. Berner, by his own admission, did not do objective mental health testing. (ECF No. 15, p. 7). Plaintiff contends the ALJ should have recontacted Dr. Sonntag for further explanation about

22

her findings or sent Plaintiff for a second consultative examination rather than accusing Dr. Sonntag of being unable to form a valid opinion when her report called only a single test result into question. (*Id*., p. 8). The Commissioner responds that the existing record adequately developed Plaintiff's impairments, and the ALJ properly weighted conflicting evidence to reach an informed decision. (ECF No. 20, p. 8).

For disability claims filed on or after March 27, 2017, an ALJ evaluates medical opinions pursuant to 20 C.F.R. § 404.1520c. These rules provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, an ALJ is to consider the persuasiveness of any opinion or prior administrative medical finding using the same five factors: (1) supportability of the opinion with relevant objective medical evidence and supporting explanations; (2) consistency with the evidence from other medical sources and nonmedical sources in the claim; (3) relationship with the claimant, including length, purpose, and extent of treatment relationship, whether it is an examining source, and frequency of examination; (4) specialization; and (5) other relevant factors. 20 C.F.R. § 404.1520c(c). The rules, however, make clear that supportability and consistency are the "most important factors" and therefore, an ALJ must explain how he considered these factors in making his decision. 20 C.F.R. § 404.1520c(b)(2).

The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). However, the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record. *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (*quoting Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994). While "[a]n ALJ

should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

The need for medical evidence does not necessarily require the Commissioner to produce additional evidence outside the record. An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision. *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001). Providing specific medical evidence to support his disability claim is the Plaintiff's responsibility with the burden of proof on Plaintiff to prove up his disability and present the strongest case possible. *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991); 20 C.F.R. §416.912(a) and (c).

Plaintiff asserts that neither nonexamining physician considered Plaintiff's PTSD, making the ALJ's opinion internally consistent as he found their opinions persuasive while also finding Plaintiff's PTSD a severe impairment. (ECF No. 15, p. 2, and ECF No. 21). As the Commissioner points out, there is a difference between the class of impairments the doctors evaluated and the listings that were considered. (ECF No. 20, p. 4). While it is true that Dr. Kramer considered only listing 12.06 Anxiety and Obsessive-Compulsive disorder, Dr. Bucolo considered the listings of 12.04 Depressive, Bipolar and Related Disorders, 12.06 Anxiety and Obsessive-Compulsive Disorders, and 12.15 Trauma and Stressor-Related Disorders. (Tr. 90–92, 112). Dr. Bucolo also considered Plaintiff's diagnosis with PTSD, major depressive disorder, and generalized anxiety disorder by Dr. Berner in 2018. (Tr. 113). It is thus apparent to the Court that Dr. Bucolo was aware of and considered Plaintiff's PTSD.   For these reasons, the Court rejects Plaintiff's argument that the ALJ's opinion was internally inconsistent.

Plaintiff argues Dr. Sonntag's opinion was evaluated inappropriately as the ALJ should have given more weight to Dr. Sonntag's findings despite Dr. Sonntag's opinion that Plaintiff appeared to be intentionally underperforming on the immediate recall portion of the examination. (ECF No. 15, pp. 4–6). However, the ALJ considered Dr. Sonntag's entire report and did not dismiss it entirely based upon some indication of poor effort in only one part of the examination. (Tr. 21–22). The ALJ considered the report's consistency with the totality of the medical evidence and with Dr. Sonntag's own observations during the consultative examination, which did not include any observations of poor concentration or attention deficits. (Tr. 22, 529). Dr. Sonntag did not opine as to Plaintiff's ability to attend to concentration and attention on basic tests, noting it was untestable.  Similarly, Dr. Sonntag did not elaborate on what would limit Plaintiff's capacity to sustain persistence in completing task, evaluating this with a single word, "poor."  The ALJ nevertheless weighed the evidence and found Dr. Sonntag's findings partially persuasive as they were somewhat consistent with Plaintiff's remaining records.

Plaintiff then argues the ALJ erred in finding Dr. Sonntag's opinion only partially persuasive as Dr. Berner opined Plaintiff had issues with concentration and attention. (ECF No. 15, pp. 6–7).  Plaintiff argues the opinion offered by Dr. Berner – Plaintiff's treating psychiatrist – was consistent with Dr. Sonntag as Dr. Berner checked a box opining that Plaintiff had issues with concentration and attention. The Commissioner argues the ALJ properly considered Dr. Berner's opinion, including the fact that it was a checkmark form along with Dr. Berner's own admission that he struggled to know how to answer the questions as he had not tested Plaintiff in these areas. (ECF No. 20, p. 7). Dr. Berner's checkmark form opinion properly was afforded less weight, particularly as it opined limitations unsupported by the medical evidence of record. *See Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018).

25

Notably, the transcript contains four medical opinions concerning Plaintiff's mental RFC: nonexamining physician Dr. Kramer; non-examining physician Dr. Bucolo; examining physician Dr. Sonntag; and treating physician Dr. Berner. (Tr. 90–92, 112–13, 527–29, 806–807). The ALJ considered each opinion and accorded them weight based upon their supportability and consistency with the record as a whole.

The Court finds the ALJ did not err in his assessment of the opinion evidence offered by Plaintiff's medical providers, and the ALJ's RFC assessment was consistent with substantial evidence contained in the well-developed record.

### C.  Past Relevant Work

Plaintiff argues the ALJ erred in finding she could perform her past relevant work, as it was facially apparent that her past relevant work as a telephone information operator required more than superficial interpersonal contact. (ECF No. 15, p. 8–10). Plaintiff brings the Court's attention to the fifth digit of the DOT code 235.662-022 for telephone operator (which is the number 6), arguing the DOT indicates this digit relates to dealing with people, including giving assignments and/or direction to helpers or assistants. Plaintiff argues this contact is not superficial contact within the plain meaning of the word, and that the VE and ALJ both failed to identify and resolve this apparent conflict, requiring remand to resolve this conflict. The Commissioner argues that Plaintiff had the opportunity to question the VE about this conflict at the hearing and declined to do so. (ECF No. 20, p. 9). The Commissioner notes Dr. Bucolo's indication that Plaintiff would be limited to routine but superficial interpersonal contact, such as that of a grocery store checker which also has a DOT code containing a fifth digit of 6, just like a telephone operator. The Commissioner cites *Kristina D.B. v. Berryhill*, No. 1:18-cv-000088, 2019 WL 1407407, at *6 (D. Me. March 28, 2019), wherein the District Court of Maine contemplated a very similar argument,

whether a fifth digit of 6 in a DOT code constituted an apparent conflict with a restriction to brief and superficial interactions with others. In *Kristina D.B.*, as in this case, Plaintiff did not raise the conflict at the hearing and the VE testified there was no conflict with the DOT.  Plaintiff did not provide any additional argument or source citation for her contention there is an apparent or actual conflict with the DOT.

An ALJ may not rely on a vocational expert's testimony about the requirements of a job if an "apparent unresolved conflict" exists between that testimony and the job's description in the Dictionary of Occupational Titles (DOT). *See Moore v. Colvin*, 769 F.3d 987, 989–90 (8th Cir. 2014) (quoting SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000)).  Vocational expert testimony is not required at step four of the analysis.  *See Hill v. Colvin,* 753 F.3d 798, 801 (8th Cir. 2014) (vocational expert testimony not required at step four where the claimant retains burden of proving he or she cannot perform prior work).

In this case, the decision was made at step four; however even if this had been a step five finding, Plaintiff has failed to show an apparent conflict that was not resolved. The ALJ's finding is supported by VE testimony and is consistent with the level of interaction opined by Dr. Bucolo. The Court finds the ALJ did not err in finding Plaintiff could perform her past relevant work as a telephone operator.

## V.      Conclusion

Accordingly, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact.**

**The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 26th day of April 2022.

*Christy Comstock*
_____
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE